UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TRNS, LLC<br>　　　　Plaintiff, | )<br>)<br>) | CASE NO. |
| vs. | )<br>) | |
| ELLEN RATNER,<br>　　　　Defendant. | )<br>)<br>)<br>) | MARCH 8, 2016 |

## COMPLAINT

Plaintiff, TRNS, LLC, by and through its attorneys, Block, Janney & Associates, LLC, complaining of the Defendant, respectfully alleges:

### PARTIES

1.　　The Plaintiff TRNS, LLC ("TRNS") is a Connecticut limited liability company with a principal office and place of business in the State of Connecticut.

2.　　The Defendant, Ellen Ratner ("Ratner"), is a citizen of the District of Columbia.

### JURISDICTION

3.　　There is complete diversity of citizenship between TRNS, the Plaintiff, and Ratner, the Defendant. As will be more fully explained herein, the amount in dispute in this action, exclusive of interest and costs, exceeds the sum of $75,000. Therefore, this court has jurisdiction over this dispute by virtue of 28 U.S.C. §1332.

### FACTUAL BASIS OF CLAIM

4.　　TRNS was formed as a limited liability company on or about January 20, 2015 by Ratner, together with Carole Mark Scott ("Scott") and Shelley Blanchette ("Blanchette"). Ratner, Scott and Blanchette were each the owners of a 1/3 interest in TRNS.

5.  Ratner, Blanchette and Scott formed TRNS to disseminate news reported throughout various forms of media. An important component of its business was access to news events at such places as the White House, the Capitol, the United Nations and the like ("News Locations"), and because of relationships that the principals of TRNS, including Ratner, had developed over a number of years, TRNS as a news reporting service, was able to obtain "credentials" which allowed TRNS and its staff entry and access to News Locations.

6.  Without credentials, one cannot gain entrance to such News Locations. These credentials further enabled TRNS to acquire:

   a.  Radio booth at the White House;

   b.  Radio booth at the House of Representatives;

   c.  Radio booth at the Senate;

   d.  Radio booth at the United Nations;

   e.  1 of 49 named seats in the White House briefing room;

   f.  Radio membership in the White House pool and the ability to join the President, UN Secretary General and Secretary of Defense on travel; and

   g.  Membership to Technical Advisory Subcommittee, which included 1 of 23 fiber optic rack spaces.

7.  TRNS, which was also known as " Talk Radio News Service" gathered news and information at the events it attended, and broadcasted such news and information on radio, television, internet and other media through its correspondents, reporters and employees.

8.  On or about February 9, 2015 Ratner, Scott and Blanchette executed an Operating Agreement which set forth the rights, responsibilities, financial interests and management of the company. This Operating Agreement was later amended on April 10, 2015 (the Operating Agreement").

9. The Operating Agreement provided that "Management of the Company shall be vested in the Manager or Managers of the Company", with the initial managers of the Company being John Grott, Ratner, Scott and Blanchette. The Operating Agreement further provides that all decisions "shall be made by a majority of such Managers".

10. The Operating Agreement further provided that certain actions required a majority vote of the Managers, including: "sale, transfer, assignment, exchange or other disposition of all or substantially ass of the assets of the Company."

11. It was the agreement and understanding of the owners of TRNS, that one of its main assets was its goodwill ("Goodwill"), which includes but is not limited to (i) relationships that the members brought into the company; and (ii) relationships that its members had with individuals that could provide exclusive access to newsworthy events.

12. To that end, this Goodwill, coupled with TRNS's access provided through its credentialing rights permitted TRNS exclusive access and insight to news sources that other organizations could not take advantage of.

13. The members of TRNS were aware of the value of the Goodwill, coupled with the access provided by the credentials, and continued to strive to provide a high quality news product to outsource to media providers.

14. In fact, when Scott and Blanchette bought their interests TRNS, which occurred at different times, Ratner represented to each of them that what they were buying into was this Goodwill, which permitted access to newsmakers and news event, and which included such privileges afforded by such Goodwill and use and control of credentials.

15. This level of access permitted the "content" to be created, which was the product of TRNS and the lifeblood of the organization.

16. TRNS is, in fact, unique among other content providers, thereby adding to its value. It is the only outsourced (independent) media content company that has bureaus at the White House, Congress (on both the House and Senate side), Pentagon and United Nations.

17. This level of access allowed a smaller content provider, such as TRNS, to compete with larger networks whose "content" is proprietary to only them.

18. This flexibility also would permit news organizations to come to TRNS and customize the type of content they want from TRNS, which included using TRNS' live feeds, and the ability to provide customized daily or weekly content.

19. All three of the members have had to make investments into the infrastructure and operations of TRNS to keep the operation running.

20. Following the formation of TRNS, Ratner indicated to the other members that she desired that TRNS to begin to seek out options to attract investors into TRNS.

21. To that end, Ratner initiated the effort to bring in John "Jay" Grott ("Grott") as the president and CEO of TRNS with the primary purposes being the securing of financing and investors in order to realize the potential value of the company.

22. As part of the enticement to get Grott on board with the position, Ratner offered Grott "stock" in TRNS.

23. Under Ratner's instruction, Grott began to seek out (i) potential offers to buy out the members' interest in TRNS and (ii) put together packages for TRNS to shop to potential investors.

24. Ratner called upon existing relationships she had with business people, friends and professionals to assist Grott as CEO in putting together a package to make TRNS attractive to potential investors.

25. Ratner also represented to Grott and the other members of TRNS that her friend and business associate, Edward Butowsky, would assist in putting together a private placement offering for funding.

26. Upon information and belief Mr. Butowsky took steps to involve himself in the financing of TRNS as the company prepared its financials in order to seek out investors.

27. Upon information and belief, Ratner indicated that Mr. Butowsky was willing to approach several of his clients as potential investors in TRNS, and Mr. Butowsky, in fact, represented that he had located clients who had expressed a willingness to invest in TRNS.

28. Ratner then specifically suggested several potential investors in TRNS, which include but are not limited to:

    a. Private wealthy individual investors;

    b. Foreign investors that would find TRNS's level of access valuable; and,

    c. U.S. based firms which could make use of TRNS content.

29. There were also potential offers directly from domestic foreign based companies about a potential multi-million dollar buyout of TRNS.

30. Mr. Butowsky and Grott worked together to put together a value to sell to private investors

31. To that end, Ratner hired and paid for Capital Fund Law Group who, with the help of Grott and Butowsky, put together an offering memorandum ("Memorandum") to send to potential investors.

32. This Memorandum was shown to and approved by Ratner.

33. The Memorandum and the offering was subsequently underwritten and brokered by WealthForge Securities, LLC.

34. The Memorandum, as approved by Ratner, was an offering to potential investors for Series A preferred membership units, entitling investors, *inter alia*, to participate in the profits of TRNS.

35. In the Memorandum, TRNS represents to its potential investors that it is capable of providing (i) more news content than its competitors, (b) exclusive news content, (c) downloadable and customizable news content, and (d) news content at a lower price, and which may give TRNS an edge over its competitors.

36. The Memorandum, as approved by Ratner, and as created, in part, with Mr. Butowsky, put a value of $5,000,000.00 on TRNS. This was a figure acknowledged and approved by Ratner.

37. Beginning in the fall of 2015, relations with Ratner became strained because of her resistant to operational changes in the company necessary for Grott to accomplish the tasks given to him by Ratner.

38. Notwithstanding Ratner's resistance to operational changes, she led Grott, Blanchette and Scott to believe that all was well with the company and business would be conducted as usual. Thereafter, Ratner and Mr. Butowsky attempted to terminate Grott as CEO and induced Scott to approve the removal of Grott.

39. Ratner then utilized the services of an attorney of Mr. Butowsky's, one Shawn Izadi, to state that she represented TRNS and attempted to fire Grott from his position within the company.

40. Attorney Izadi was never formally retained by TRNS.

41. Ratner failed to follow any of the notice , and other requirements of the Operating Agreement in regards to the retention of an attorney and termination of Grott.

42. However, Ratner decided that rather than to attempt to resolve the management issues within the confines of the business operations of TRNS, she began to surreptitiously appropriate certain assets of TRNS without the knowledge of approval of the other members.

43. On or about December 8, 2015, Ratner resigned from TRNS and formed and began doing business as "Talk Media News Service".

44. On information and belief, Talk Media News Service is company which is solely owned and controlled by Ratner, who represented to third persons that it was the same business as TRNS.

45. On information and belief, Ratner took, adopted and used, without the consent of the company, the "credentials", together with hiring substantially all of TRNS employees.

46. Ratner also took advantage of the Goodwill which is an asset of TRNS and used it against the interests of TRNS. This is not just an act of competition, but an absconding of business assets at the detriment of TRNS and her business partners.

47. Ratner also commandeered personal property of TRNS to directly compete with TRNS's business operations.

48. Further, Ratner induced employees of TRNS to quit their position with TRNS and go work for her new company.

49. In fact, Ratner utilized certain TRNS assets to broadcast content of Talk Media News Service in direct conflict with the best interests of TRNS.

50. Talk Media News Service is being operated as by Ratner as a separate company from TRNS, which has taken substantially all of the assets of TRNS, the most valuable of which are the Goodwill and the use and control of "credentials" which have a value that was represented in the offering statement approved by Ratner of $5,000,000.

51. Moreover, Ratner's actions of directly communicating and calling upon relationships built upon the goodwill bought and owned by TRNS, has harmed TRNS in that it may never be able to re-establish these relationships again after Ratner's action "poisoned the well" with her representations and statements against the interests of TRNS and at the expense of TRNS and her partners.

## COUNT ONE – BREACH OF FIDUCIARY DUTY

53. The Plaintiff incorporates Paragraphs 1-52 as if fully set forth herein.

54. Ratner, as a member and Manager of TRNS owed a fiduciary duty to the Company, to not take any action contrary to the business and financial interests of the Company.

55. Ratner breached her fiduciary duty in one of more of the following ways: (a) forming a competing business; (b) taking the assets of TRNS using the "credentials" issued to and controlled through TRNS; (c) hiring and utilizing substantially all of the TRNS employees.

56. Ratner's aforesaid breach of fiduciary duty has destroyed the business of TRNS, and caused the business to suffer damages.

## COUNT TWO – CONVERSION

57. The Plaintiff incorporates Paragraphs 1 – 56 as if fully set forth herein.

58. TRNS has made demand upon Ratner to return the credentials and other assets to TRNS, to cause TRNS to re-hire its employees, and restore its ability to operate its business, all of which Ratner has neglected and refused to do.

59. Ratner's conduct was neither authorized nor ratified by TRNS and its members or managers.

60. TRNS has been damaged by the removal of its assets, loss of its credentials, loss of access to New Events and the hiring of its employees, all of which constitute the unauthorized theft of its properties and business.

61. Ratner's actions constitute conversion of TRNS assets and business for Ratner's benefit, was knowing, intentional and malicious, intending to do damage to TRNS, and in conscious and reckless disregard to TRNS' rights.

## THIRD COUNT – STATUTORY THEFT

62. The Plaintiff incorporates Paragraphs 1 – 61 as if fully set forth herein.

63. Ratner stole the assets and business from TRNS and is using them, including controlling the "credentials" for her benefit and the benefit of her business known as Talk Media News Service.

64. Ratner is liable for statutory theft and for treble damages as provided by Conn. Gen. Stat. Section 52-564.

## FOURTH COUNT – UNFAIR COMPETITION

65. The Plaintiff incorporates Paragraphs 1 – 64 as if fully set forth herein.

66. Ratner's actions constitute a violation of Connecticut's Unfair Trade Practices Act, Conn. Gen. Stat. §42-110a, et. seq. and/or constitutes unfair competition under the common law, in that said actions by Ratner were immoral, oppressive and unscrupulous and caused substantial injury and monetary damage to TRNS.

## PRAYER FOR RELIEF

Plaintiff request that the court grant judgment against the Defendant:

1. For compensatory damages in an amount to be determined by the trier of fact to be sufficient to punish and deter the Defendant for the damages caused by the Defendant.

2. For punitive or exemplary damages in an amount determined by the trier of fact to be sufficient to punish and deter the Defendant for the damages caused by the Defendant.

3. For treble damages as provided by Conn. Gen. Stat. Section 52-564.

4. For an injunction prohibiting the Defendant from making use of the assets taken from the Plaintiff, and representing that the Defendant is the owner or holder of the "credentials".

5. For an order requiring the Defendant to restore the assets, including the "credentials" to the Plaintiff.

6. For a declaration that the Goodwill and other property taken from the Plaintiff is the property of the Plaintiff.

7. For a declaration that all "credentials" and "credentialing rights" are the property of the Plaintiff.

8. For a declaration that the transfer of the assets and Goodwill is null and void.

9. For a declaration that the name Talk Media News Service and all other intellectual property adopted by Ratner is owned by the Plaintiff.

10. For costs of suit.

11. For reasonable attorney's fee.

12. For all other relief that is just and proper.

ATTORNEY FOR THE PLAINTIFF

By _____
Mark E. Block – ct06557
Block, Janney & Associates, LLC
138 Main Street
Norwich, CT 06360
Telephone: 860-889-3855
Fax: 860-886-6352
Email: mblock@bjplawyers.com

M:\MEB\TRNS\TRNS Complaint 3-6 final red.docx